**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ MAR 29 2010 ☆

BROOKLYN OFFICE

|  |  |
|---|---|
| GEORGE YOURGAL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) **CIVIL ACTION NO.** |
| vs. | ) **CV 10 - 1405** ) ) **CLASS ACTION COMPLAINT** ) |
| SMITHTOWN BANCORP, INC., BRADLEY E. ROCK, ANITA M. FLOREK, PATRICK A. GIVEN, ROBERT W. SCHERDEL, HYUKMUN KWON, BARRY M. SEIGERMAN, MANNY SCHWARTZ, GEORGE H. DUNCAN, PATRICIA C. DELANEY, JOSEPH M. WINTERS and SANDLER O'NEILL & PARTNERS, L.P., | ) ) **JURY TRIAL DEMANDED** ) ) ) ) TRAGER, J. ) ) |
| Defendants. | ) LEVY, M.J. ) |

Plaintiff, George Yourgal ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Smithtown Bancorp, Inc. ("SBI" or the "Company") and securities analysts' reports and advisories about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal class action on behalf of purchasers of the securities of SBI, who purchased or otherwise acquired SBI securities between March 13, 2008 and February 1, 2010,

1

inclusive (the "Class Period"), including purchasers of the securities issued pursuant or traceable to the Company's public offering (the "Offering") on or about May 14, 2009, seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      SBI is the holding company of Bank of Smithtown, which bills itself as the largest independent commercial bank headquartered on Long Island.   Additionally, SBI has three wholly-owned subsidiaries: Smithtown Bancorp Capital Trust I, Smithtown Bancorp Capital Trust II and Smithtown Bancorp Capital Trust III.   These subsidiaries were formed for the purpose of issuing trust preferred securities.

3.      On or about May 14, 2009, the Company conducted the Offering.  In connection with the Offering, SBI issued a series of Prospectus Supplements to the Prospectus dated December 1, 2008 (collectively, these documents are referred to as the "Offering Materials"). The Offering was a financial success for the Company, as it generated gross proceeds of approximately $30 million by selling 3 million shares of SBI stock to investors at a price of $10.00 per share.

4.      Prior to and throughout the Class Period, SBI touted, among other things, its credit quality ratios and the soundness of its accounting and reporting policies.

5.      However, beginning on November 2, 2009, the truth about the Company began to be revealed.  On that date, the Company announced that its 2009 third quarter earnings were reduced by a provision of $10 million to its loan loss reserves.  Further, the Company stated that it expected levels of nonperforming loans, loan loss provisions and charge-offs to continue to be higher in the forthcoming quarter and into 2010.  Despite this, the Company stated that it continued "to show strong signs of building a valuable franchise."

2

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE YOURGAL, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | **CIVIL ACTION NO.** |
| vs. ) | |
| ) | CLASS ACTION COMPLAINT |
| SMITHTOWN BANCORP, INC., BRADLEY E. ROCK, ANITA M. FLOREK,  PATRICK A. GIVEN, ROBERT W. SCHERDEL, HYUKMUN KWON, BARRY M. SEIGERMAN, MANNY SCHWARTZ, GEORGE H. DUNCAN, PATRICIA C. DELANEY, JOSEPH M. WINTERS and SANDLER O'NEILL & PARTNERS, L.P., ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

Plaintiff, George Yourgal ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Smithtown Bancorp, Inc. ("SBI" or the "Company") and securities analysts' reports and advisories about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION AND OVERVIEW</u>

1.      This is a federal class action on behalf of purchasers of the securities of SBI, who purchased or otherwise acquired SBI securities between March 13, 2008 and February 1, 2010,

inclusive (the "Class Period"), including purchasers of the securities issued pursuant or traceable to the Company's public offering (the "Offering") on or about May 14, 2009, seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      SBI is the holding company of Bank of Smithtown, which bills itself as the largest independent commercial bank headquartered on Long Island.   Additionally, SBI has three wholly-owned subsidiaries: Smithtown Bancorp Capital Trust I, Smithtown Bancorp Capital Trust II and Smithtown Bancorp Capital Trust III.   These subsidiaries were formed for the purpose of issuing trust preferred securities.

3.      On or about May 14, 2009, the Company conducted the Offering.   In connection with the Offering, SBI issued a series of Prospectus Supplements to the Prospectus dated December 1, 2008 (collectively, these documents are referred to as the "Offering Materials"). The Offering was a financial success for the Company, as it generated gross proceeds of approximately $30 million by selling 3 million shares of SBI stock to investors at a price of $10.00 per share.

4.      Prior to and throughout the Class Period, SBI touted, among other things, its credit quality ratios and the soundness of its accounting and reporting policies.

5.      However, beginning on November 2, 2009, the truth about the Company began to be revealed.   On that date, the Company announced that its 2009 third quarter earnings were reduced by a provision of $10 million to its loan loss reserves.   Further, the Company stated that it expected levels of nonperforming loans, loan loss provisions and charge-offs to continue to be higher in the forthcoming quarter and into 2010.   Despite this, the Company stated that it continued "to show strong signs of building a valuable franchise."

2

6.     Upon the release of this news, shares of the Company's stock declined $1.44 per share, or 13.91 percent, to close on November 2, 2009 at $8.91 per share, on heavy trading volume.

7.     Over the next several weeks, the Company issued a series of announcements, including announcing the appointment of a new President/Chief Operating Officer ("COO") and new Executive Vice President/Chief Financial Officer ("CFO"), and the resignation of the Company's Executive Vice President/Chief Commercial Lending Officer.   Additionally, SBI announced that due to its expected levels of nonperforming loans and loan loss provisions for the near future, there would be no cash dividend for the fourth quarter of 2009.   As the reality of the Company's dire situation became clearer to investors, the value of SBI's shares began to decline further.   By the time the Company made the announcement regarding the fourth quarter dividend on December 22, 2009, SBI's stock was trading at $4.65 per share.

8.     Finally, on February 1, 2010, the Company announced dismal results for the fourth quarter of 2009.   This included a quarterly loss of $19.8 million (and net loss for the year of $11.8 million), due to a provision of $38 million to the Company's loan loss reserves and a write-down of $7 million to another real estate owned property.   Additionally, the Company shocked investors when it announced that its subsidiary, Bank of Smithtown, had entered into a Consent Agreement with the Federal Deposit Insurance Corporation ("FDIC") and a parallel Consent Order with the New York State Banking Department ("NYSBD") (the Consent Agreement and Consent Order are collectively referred to as the "Consent Agreement").   Under the Consent Agreement, the bank was required to, among other things, improve credit administration, loan underwriting, internal loan review process, and maintain an adequate allowance for loan losses.   Further, the bank was required to implement plans to reduce classified

3

assets, decrease the bank's concentration in commercial real estate loans, and increase its profitability.

9.      On this news, SBI's stock fell $0.81 per share, or 14.97 percent, to close on February 1, 2010 at $4.60 per share, on heavy trading volume. SBI's stock has not recovered by an appreciable extent since that time.

10.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, financial statements, operations and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that SBI had materially understated its loan loss reserves; (2) that SBI had failed to state certain of its assets at their fair value; (3) that the Company had delayed recognition of impaired assets; (4) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (5) that the Company lacked adequate internal and financial controls; (6) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times; (7) that the Company, through its subsidiary, was engaged in unsafe and/or unsound banking practices; and (8) that as a result, the Company lacked any reasonable basis for positive statements regarding the Company, its growth and/or its prospects.

11.     Further, for the reasons stated above, the Company's Offering Materials issued in connection with its May 14, 2009 equity offering were false and misleading at all relevant times.

12.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members suffered damages.

4

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

15.    Venue is proper in this District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, SBI's principal executive offices are located within this District.

16.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## PARTIES

17.    Plaintiff, George Yourgal, as set forth in the accompanying certification, incorporated by reference herein, purchased SBI securities at artificially inflated prices during the Class Period and has been damaged thereby.

18.    Defendant SBI is a New York corporation with its principal executive offices located at 100 Motor Parkway, Suite 160, Hauppauge, New York.

19.    Defendant Bradley E. Rock ("Rock") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors.

20.     Defendant Anita M. Florek ("Florek") was, at relevant times, the Company's Executive Vice President and CFO, and beginning in November 2009, the Company's Executive Vice President and Chief Accounting Officer.

21.     Defendant Patrick A. Given ("Given") was, at all relevant times, a member of the Company's Board of Directors.

22.     Defendant Robert W. Scherdel ("Scherdel") was, at all relevant times, a member of the Company's Board of Directors.

23.     Defendant Hyukmun Kwon ("Kwon") was, at all relevant times, a member of the Company's Board of Directors.

24.     Defendant Barry M. Seigerman ("Seigerman") was, at all relevant times, a member of the Company's Board of Directors.

25.     Defendant Manny Schwartz ("Schwartz") was, at all relevant times, a member of the Company's Board of Directors.

26.     Defendant George H. Duncan ("Duncan") was, at all relevant times, a member of the Company's Board of Directors.

27.     Defendant Patricia C. Delaney ("Delaney") was, at all relevant times, a member of the Company's Board of Directors.

28.     Defendant Joseph M. Winters ("Winters") was, at all relevant times, a member of the Company's Board of Directors.

29.     Defendants Rock, Florek, Given, Scherdel, Kwon, Seigerman, Schwartz, Duncan, Delaney and Winters are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of SBI's reports to the SEC, press releases and presentations to

securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

30.    Defendant Sandler O'Neill & Partners, L.P. ("Sandler O'Neill" or the "Underwriter Defendant") was the underwriter of the Company's May 14, 2009 stock offering, and served as a financial advisor and assisted in the preparation and dissemination of the Offering Materials for SBI's stock offering.

## SUBSTANTIVE ALLEGATIONS

### Background

31.    SBI is the holding company of Bank of Smithtown, which bills itself as the largest independent commercial bank headquartered on Long Island. Additionally, SBI has three wholly-owned subsidiaries: Smithtown Bancorp Capital Trust I, Smithtown Bancorp Capital Trust II and Smithtown Bancorp Capital Trust III. These subsidiaries were formed for the purpose of issuing trust preferred securities.

### Materially False and Misleading
### Statements Issued During the Class Period

32.    The Class Period begins on March 13, 2008. On this day, SBI filed with the SEC

7

its Form 10-K for the fiscal year ended December 31, 2007. The March 13, 2008 Form 10-K was signed by defendants Rock, Florek, Duncan, Given, Schwartz, Seigerman, Scherdel, Delaney and Kwon, and attested to the Company's supposedly effective internal control over financial reporting. Additionally, the Company's Form 10-K stated, in relevant part:

**Disclosure Controls and Procedures**

An evaluation was performed under the supervision and with the participation of the Company's management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) promulgated under the Securities and Exchange Act of 1934, as amended) as of December 31, 2007. Based on that evaluation, *the Company's management, including the Chief Executive Officer and Chief Financial Officer, concluded that the Company's disclosure controls and procedures were effective.*

Report by Management On Internal Control Over Financial Reporting

Management of Smithtown Bancorp, Inc. is responsible for establishing and maintaining an effective system of internal control over financial reporting. The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. There are inherent limitations in the effectiveness of any system of internal control over financial reporting, including the possibility of human error and circumvention or overriding of controls. Accordingly, even an effective system of internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

*Management assessed the Company's system of internal control over financial reporting as of December 31, 2007. This assessment was based on criteria for effective internal control over financial reporting described in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management believes that, as of December 31, 2007, the Company maintained effective internal control over financial reporting based on those criteria.*

\*　　　\*　　　\*

8

*There has been no change in the Company's internal control over financial reporting during the quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.* [Emphasis added.]

33.     The Company's March 13, 2008 Form 10-K also contained Sarbanes-Oxley required certifications, signed by defendants Rock and Florek, who stated:

I, [Bradley E. Rock/Anita M. Florek], certify that:

1.     I have reviewed this report on Form 10-K of Smithtown Bancorp;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.     The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

a.     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiary, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.     evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      disclosed in this report any change in the Registrant's internal controls over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal controls over financial reporting.

5.      The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the Registrant's auditors and the audit committee of Registrant's Board of Directors (or persons performing the equivalent function):

a.      all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b.      any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls over financial reporting.

*      *      *

In connection with the Annual Report of Smithtown Bancorp, Inc. on Form 10-K for the period ended December 31, 2007 as filed with the Securities and Exchange Commission (the "Report"), Bradley E. Rock, Chairman, President and Chief Executive Officer and Anita M. Florek, Executive Vice President and Chief Financial Officer of Smithtown Bancorp, Inc. each certify in their capacity as officers of the Company that to the best of their knowledge: the Report fully complies with the requirements of Sections 13(a) of the Securities Exchange Act of 1934; and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations.

The purpose of this statement is solely to comply with Title 18, Chapter 63, Section 1350 of the United States Code, as amended by Section 906 of the Sarbanes-Oxley Act of 2002.

34.      On April 24, 2008, the Company issued a press release entitled "Smithtown

Bancorp Announces First Quarter Earnings." This press release was memorialized in a Form 8-

K filed with the SEC on the following day. The press release stated, in relevant part:

Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced that the Company had earnings for the first quarter of 2008 of $3,573,886, or $.37 per share. These figures represent a 6% increase in net income and a 6% increase in basic earnings per share. Basic earnings per share for the last twelve months now stand at $1.49.

10

\*     \*     \*

*Asset quality remained strong. Nonperforming loans were .14% of total loans at the end of the quarter.* The small increase of 7 basis points in nonperformers from $687,000 at December 31st to $1.6 million at March 31st is attributable to one relationship where the borrower has died and the loans are well-secured by multiple properties. The Bank does not hold any sub-prime loans, "Alt-A" loans, option ARMs, 2/28 ARMs or loans with teaser rates.

\*     \*     \*

The Company's Chairman & CEO, Brad Rock, commented: "It has become clear that the current economic environment is creating opportunities for us. Many of our competitors have had to curtail lending due to capital constraints or liquidity constraints caused by sub-prime mortgage problems and other difficulties. As a result, we have greatly increased opportunities for permanent commercial mortgage lending. Most of these loans are on fully-tenanted commercial and multi-family buildings with seasoned cash flows. *Because of recent Fed rate cuts and the high quality of these loans, the rates on these loans are somewhat lower than what we are accustomed to, but the volume of these loans available to us is unprecedented for our Company.* Last year, loans grew by $135 million. For the first quarter of this year, loans grew by $140 million. We expect these increased lending opportunities to continue for the near future, which should allow us to build a significantly increased revenue stream." [Emphasis added.]

35.     As a result of this news, SBI's stock increased $0.77 per share, or 4.13%, to close on April 24, 2008 at $19.43 per share.

36.     On May 8, 2008, SBI filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Rock and Florek, and reaffirmed the Company's financial results previously announced on April 24, 2008. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 33, *supra*. Additionally, the Form 10-Q stated, in relevant part:

In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.

37.     On July 17, 2008, the Company issued a press release entitled "Smithtown Bancorp Announces Second Quarter Earnings." This press release was memorialized in a Form

8-K filed with the SEC on the following day.  The Company's July 17, 2008 press release stated, in relevant part:

> Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced that the Company had earnings for the second quarter of 2008 of $3,952,503 or $.40 per share. These figures represent an 8% increase in earnings on a year-over-year basis and an 11% increase in earnings on a linked-quarter basis. Basic earnings per share for the last twelve months now stand at $1.51.
>
> \*      \*      \*
>
> ***Asset quality remained very strong.*** Nonperforming loans were $2.8 million or .21% of total loans at the end of the quarter. The increase of 7 basis points in nonperformers from March 31st is attributable to one single-family construction loan which management believes is well-secured. Loans 30-89 days past due were at $150,000, or .01% of total loans. Net charge-offs for the first six months were $1,400, or .0001% of average total loans. The Bank does not hold any sub-prime loans, "Alt-A" loans, option ARMs, 2/28 ARMs or loans with teaser rates.
>
> ***The Company's capital ratios also remained strong.*** All of the Company's regulatory capital ratios are in the "well capitalized" range, with Tier I Leverage at 7.71%, Tier I Risk-Based Capital at 8.67% and Total Risk-Based Capital at 10.36%. ***The Company regularly monitors its capital ratios and evaluates all of its options in light of its asset growth, earnings growth and market conditions at the time.***
>
> \*      \*      \*
>
> The Company's Chairman & CEO, Brad Rock, commented: "The current economic environment and competitive environment in our market area continues to create opportunities for us. Many of our competitors have had to curtail lending due to capital constraints or liquidity constraints caused by sub-prime mortgage problems and other difficulties. Other competitors have been acquired by large, out-of-state companies that are much less focused on mortgage lending in our market area. Finally, the 'conduit' market for commercial mortgage loans has dried up entirely. As a result of these multiple factors, we have greatly increased opportunities for permanent commercial mortgage lending. The loan mix in our portfolio is shifting toward more loans on fully-tenanted multi-family and commercial buildings with seasoned cash flows. ***We are pleased with this shift because it enables us to continue to grow our loan portfolio while maintaining the strong credit quality that has been a hallmark of our Company for many, many years."*** [Emphasis added.]

38.     In response to this news, SBI's stock increased $1.27 per share, or 7.49%, to close

on July 17, 2008 at $18.23 per share.

39.     On August 8, 2008, SBI filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Rock and Florek, and reaffirmed the Company's financial results previously announced on July 17, 2008.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 33, *supra*.  Additionally, the Form 10-Q stated, in relevant part:

> ***In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.***

*       *       *

> The allowance for loan losses is established and maintained through a provision for loan losses based on probable incurred losses inherent in the Bank's loan portfolio. ***Management, through its Asset Quality Committee, comprised of several members of executive management as well as the chief collection officer, evaluates the adequacy of the allowance on a quarterly basis. Adjustments are made at this time to a level deemed adequate by the Committee, based on its risk evaluation of the portfolio in its entirety as well as in specific loan details. The allowance is comprised of both individual valuation allowances and loan pool valuation allowances.***

> ***The Bank monitors its entire loan portfolio on a regular basis, with consideration given to detailed analysis of classified loans, repayment patterns, probable incurred losses, past loss experience, current economic conditions and various types of concentrations of credit. Additions to the allowance are charged to expense and realized losses, net of recoveries, are charged to the allowance.***

*       *       *

> Although the allowance for loan losses has two separate components, one for impairment losses on individual loans and one for collective impairment losses on pools of loans, the entire allowance for loan losses is available to absorb realized losses as they occur whether they relate to individual loans or pools of loans. At June 30, 2008 and December 31, 2007, management believed the allowance for loan losses had been established and maintained at a level adequate to reflect the probable incurred losses in the Bank's loan portfolio.

*       *       *

13

**Concentration of loan portfolio**

The Bank generally invests a large proportion of its assets in loans secured by commercial and residential real estate properties. While we do not expect a substantial decline in real estate values and economic conditions on Long Island and in the New York metropolitan area, a decline in these values or economic activities could have an impact on the value of collateral securing the loans as well as the ability for the repayment of loans. See a further discussion in "Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations" under "Loans".

*The Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System and the FDIC have observed that commercial real estate is an area in which some banks have become increasingly concentrated.* These agencies support banks serving a vital role in their communities by supplying credit for business and real estate development. *However, the agencies are concerned that rising commercial real estate loan concentrations may expose institutions to unanticipated earnings and capital volatility in the event of adverse changes in commercial real estate markets.* As a result of this concern, the agencies issued Commercial Real Estate Guidance ("CRE guidance") in December 2006 to ensure that institutions with such concentrations maintain strong risk management practices and appropriate levels of capital. This CRE guidance does not impose any limits on the level of commercial real estate lending made by banks. *The Bank has incorporated several actions in lending administration as part of its enhanced credit risk management processes, including the addition of a credit risk manager and the preparation of concentration reports for review and determination of risk ratings.* [Emphasis added.]

40.   On October 7, 2008, SBI filed with the SEC a Form S-3 Registration Statement (the "2008 Registration Statement") which was signed by defendants Rock, Florek, Delaney, Given, Duncan, Kwon and Seigerman.  The 2008 Registration Statement stated that from time to time the Company would sell up to 3,000,000 of its common shares.  The SEC declared the 2008 Registration Statement effective on or about December 1, 2008, and it would later be supplemented by the Offering Materials.  Additionally, the 2008 Registration Statement stated, in relevant part:

*The SEC allows us to "incorporate by reference" information that we file with the SEC into this prospectus, which means we can disclose important*

*information to you by referring you to another document. The information incorporated by reference is considered to be a part of this prospectus from the date on which we file that document.* Any reports filed by us with the SEC after the date of this prospectus and before the termination of the offering of the securities by means of this prospectus will automatically update and, where applicable, supersede information contained in this prospectus or incorporated by reference into this prospectus.

Information about our business and results of operations, financial condition, cash flows, management and other financial and operational data is available in the following documents, which can be accessed at http://www.sec.gov and are incorporated herein by reference (other than, in each case, any document or information that is deemed to have been furnished and not filed in accordance with SEC rules):

- **Annual Report on Form 10-K for the year ended December 31, 2007;**

- Proxy Statement dated March 13, 2008;

- **Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 and June 30, 2008;**

- Current Reports on Form 8-K filed: . . . April 25, 2008 [Emphasis added.]

41.    On October 27, 2008, the Company issued a press release entitled "Smithtown Bancorp Announces Third Quarter Earnings."  This press release was memorialized in a Form 8-K filed with the SEC on the following day.  The press release stated, in relevant part:

Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced that the Company had earnings for the third quarter of 2008 of $4,607,000 or $.47 per share. These figures represent an 21% increase in net income and a 21% increase in diluted earnings per share on a year-over-year basis, and a 17% increase in net income and an 18% increase in diluted earnings per share on a linked-quarter basis. Diluted earnings per share for the last twelve months now stand at $1.59. Return on average equity for the last twelve months was 18.31%.

\*        \*        \*

*Asset quality remained very strong.* Nonperforming loans were $2.8 million or .19% of total loans at the end of the quarter. Loans 30-89 days past due were at $432,000, or .03% of total loans. Net charge-offs for the third quarter were $90,316, resulting from the charge-off of one "small business" line of credit. This charge-off represents less than .01% of average total loans during the third quarter. Net loan charge-offs for the first nine months were $91,346, also

representing less than .01% of average total loans for the period. The Bank does not have any sub-prime loans, "Alt-A" loans, option ARMs, 2/28 ARMs or loans with teaser rates. In addition, the Bank does not hold any Fannie Mae or Freddie Mac preferred stock.

*The Company's capital ratios, which have always been strong and in the "well-capitalized" range, grew even stronger as a result of the Company's completion of its $27.5 million capital offering at the end of the quarter.* At September 30th, Tier I Leverage stood at 9.37%, Tier I Risk-Based Capital at 11.13% and Total Risk-Based Capital at 12.00%. The Company also filed a "shelf registration" which, when approved, will give the Company the ability to issue up to 3 million additional common shares in a public offering. The Company has no present intention to issue any additional common shares, but felt that the often-used tool of a "shelf registration" was a prudent step to take, particularly in light of the recent volatile economic conditions.

*   *   *

The Company's Chairman & CEO, Brad Rock, commented: "Even during economic hard times there are good loans to be made. The challenge is to find them, and to have the capital and funding needed to make the loans. Because we don't have any sub-prime mortgages, option ARMs, Fannie or Freddie stock and the other kinds of assets that caused losses to so many of our competitors, we have money to lend and capital to support the growth. So, this has been a time of opportunity for us."

*   *   *

*"We are also pleased with the results from our recent capital offering. Despite the 'financial crisis' atmosphere, we were able to raise the full amount of capital we sought at a price that was consistent with the discounts in other similar transactions at the time. The alternative for us during the third quarter was plain: stop growing. We could be happy that we don't have the problems that have hurt others, and shift to a 'standstill' position to ride out the balance of the storm. Such a choice would also bring the growth in shareholder value to a halt.* We decided instead that the opportunities created by these turbulent times are too good to turn away. *The fact that we were one of the few community banking companies able to raise private capital in these times of economic distress represents a recognition of our Company's consistently strong performance over a long period of time. We also feel that the significant earnings growth during the third quarter demonstrates that the opportunities in the marketplace are worthwhile."* [Emphasis added.]

42.    On November 7, 2008, SBI filed its Quarterly Report with the SEC on Form 10-

Q. The Company's Form 10-Q was signed by defendants Rock and Florek, and reaffirmed the

16

Company's financial results previously announced on October 27, 2008. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 33, *supra*. Additionally, the Form 10-Q stated, in relevant part:

> *In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.*

*     *     *

**Allowance for Loan Losses**

In preparing the consolidated financial statements, management is required to make estimates and assumptions that affect the reported asset and liability balances and revenue and expense amounts. Our determination of the allowance for loan losses is a critical accounting estimate because it is based on our subjective evaluation of a variety of factors at a specific point in time and involves difficult and complex judgments about matters that are inherently uncertain. In the event that management's estimate needs to be adjusted based on, among other things, additional information that comes to light after the estimate is made or changes in circumstances, such adjustment could result in the need for a significantly different allowance for loan losses and thereby materially impact, either positively or negatively, the Bank's results of operations.

The allowance for loan losses is established and maintained through a provision for loan losses based on probable incurred losses inherent in the Bank's loan portfolio. *Management, through its Asset Quality Committee, comprised of several members of executive management as well as the chief collection officer, evaluates the adequacy of the allowance on a quarterly basis. Adjustments are made at this time to a level deemed adequate by the Committee, based on its risk evaluation of the portfolio in its entirety as well as in specific loan details.* The allowance is comprised of both individual valuation allowances and loan pool valuation allowances.

*The Bank monitors its entire loan portfolio on a regular basis, with consideration given to detailed analysis of classified loans, repayment patterns, probable incurred losses, past loss experience, current economic conditions and various types of concentrations of credit. Additions to the allowance are charged to expense and realized losses, net of recoveries, are charged to the allowance.*

*     *     *

17

Although the allowance for loan losses has two separate components, one for impairment losses on individual loans and one for collective impairment losses on pools of loans, the entire allowance for loan losses is available to absorb realized losses as they occur whether they relate to individual loans or pools of loans. At September 30, 2008 and December 31, 2007, management believed the allowance for loan losses had been established and maintained at a level adequate to reflect the probable incurred losses in the Bank's loan portfolio. [Emphasis added.]

43.    On January 28, 2009, the Company issued a press release entitled "Smithtown Bancorp Announces Fourth Quarter Earnings and Year-End Results." This press release was memorialized in a Form 8-K filed with the SEC on the following day. The press release stated, in relevant part:

Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced earnings for the year 2008 of $15,723,044, a record level of net income, and a 10% increase over the prior year. This achievement marks the Company's 14th consecutive year of record earnings. These earnings also reflect fully-diluted earnings per share for the year of $1.55, a 5% increase over fully-diluted EPS for the prior year.

Earnings for the fourth quarter of 2008 were $3,590,010, or $.31 per share. These earnings reflect a 6% increase over the fourth quarter of last year. These fully-diluted earnings per share represent an 11% decrease as compared with the same period last year as a result of the Company's common stock offering that was completed at the end of the third quarter.

*     *     *

***All of the Bank's credit quality ratios continue to be significantly better than those of peer group banks.*** Nonperforming loans at year-end were at $5.26 million, or .31% of total loans. This figure increased from the previous quarter's end primarily as a result of adding five related three-family homes. The borrower has reported that he has contracts to sell the homes for sums sufficient to satisfy the debts, but whether those sales are concluded or whether the Bank will have to foreclose the mortgages remains to be seen. In spite of this small increase, the .31% nonperforming loan ratio compares very favorably to the peer group ratio of 1.88%.

Loans 30-89 days past due were at $5.23 million, or .31% of total loans also. Similarly, this figure has increased from the previous quarter's end as a result of adding two single-family homes. The borrowers have received offers to purchase the homes at prices that exceed the amount of the debts, but whether those sales will be concluded or whether the Bank will have to foreclose remains to be seen.

Again, in spite of this increase, the .31% ratio compares very favorably with the peer group ratio of .94%.

\*     \*     \*

Net charge-offs for the fourth quarter were approximately $56,000. Net charge-offs for the year 2008 were approximately $147,000, with $87,000 of these being attributable to loans and $60,000 attributable to the Bank's overdraft protection program. The combined total net charge-offs represent less than .01% of average loans.

\*     \*     \*

The Company's Chairman & Chief Executive Officer, Brad Rock, commented: "This past year was the most difficult year for our nation's economy and financial companies since the 1930s. In spite of the 'financial crisis' conditions, we grew earnings at a double-digit pace and significantly expanded our market share. We did so by maintaining those parts of our strategy that worked well in the past, and by shifting other parts of our strategy to take advantage of opportunities created by the year's unusual events and circumstances.

\*     \*     \*

Mr. Rock continued: "Financial stocks were battered during the course of the year by the steady barrage of bad economic news and, although Smithtown Bancorp was no exception, *our Company's strong performance helped the shares fare better than those of most financial companies.* All three major stock indexes were 'underwater' for all 253 trading days during 2008. The S&P 500 was down 39%, the worst year in more than seven decades. The SNL index for Northeast banks was down 45%. The price for Smithtown Bancorp shares was down 27.66%, a hard hit to be sure, but nonetheless a demonstration of some resilience compared to other companies.

"We do not and could not know what the year ahead holds for our nation's economic system. The new President and Congress have promised an entire revamping of the financial regulatory system and other sweeping economic changes. Some think that we have not yet seen the worst of the 'financial crisis' and that 2009 will be worse than 2008. Others think that changes will take hold and by mid-year we will begin to turn a corner toward more normalcy in our economy.

*"In any event, no matter what economic conditions lie ahead, we are confident that we will continue our 100 years of strength and stability. When the nation emerges from the current 'financial crisis', we will be even better positioned than before to provide the lending and deposit services that our customers need, and to build the shareholder value that has been the hallmark of our Company for so many years."* [Emphasis added.]

19

44.     On March 12, 2009, the Company filed its Annual Report with the SEC on Form 10-K. The Company's Form 10-K was signed by the Individual Defendants, and reaffirmed the Company's financial results previously announced on January 28, 2009. The Company's Form 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 33, *supra*. Additionally, the Form 10-K stated:

> **The accounting and reporting policies of Smithtown Bancorp, Inc. and its bank subsidiary, Bank of Smithtown, reflect banking industry practices and conform to U.S. generally accepted accounting principles.** A summary of the significant accounting policies followed by the Company in the preparation of the accompanying consolidated financial statements is set forth below.
>
> *        *        *
>
> **Allowance for Loan Losses**
>
> **The allowance for loan losses is a valuation allowance for probable incurred credit losses. Loan losses are charged against the allowance when management believes the uncollectibility of a loan balance is confirmed. Subsequent recoveries, if any, are credited to the allowance. Management estimates the allowance balance required using past loan loss experience, the nature and volume of the portfolio, information about specific borrower situations and estimated collateral values, economic conditions and other factors. Allocations of the allowance may be made for specific loans, but the entire allowance is available for any loan that, in management's judgment, should be charged off.**
>
> *        *        *
>
> The Bank generally invests a large proportion of its assets in loans secured by commercial and residential real estate properties on Long Island and the New York metropolitan area. While the Company does not expect a substantial decline in real estate values and economic conditions on Long Island and in the New York metropolitan area, a decline in these values or economic activities could have an impact on the value of collateral securing the loans as well as the ability for the repayment of loans. In addition, at December 31, 2008, construction loans represented 23% of the Company's loan portfolio and multi-family loans represented 18% of its loan portfolio. See a further discussion in "Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations" under "Loans".
>
> **The Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System and the FDIC have observed that commercial real estate is an area in which some banks have become increasingly concentrated.**

20

These agencies support banks serving a vital role in their communities by supplying credit for business and real estate development. *However, the agencies are concerned that rising commercial real estate loan concentrations may expose institutions to unanticipated earnings and capital volatility in the event of adverse changes in commercial real estate markets.* As a result of this concern, the agencies issued Commercial Real Estate Guidance ("CRE Guidance") in December 2006 to ensure that institutions with such concentrations maintain strong risk management practices and appropriate levels of capital. This CRE Guidance does not impose any limits on the level of commercial real estate lending made by banks. *The Bank has incorporated several actions in lending administration as part of its enhanced credit risk management processes, including the addition of a credit risk manager and the preparation of concentration reports for review and determination of risk ratings.* [Emphasis added.]

45.     On April 29, 2009, the Company issued a press release entitled "Smithtown Bancorp Announces First Quarter Earnings." This press release was memorialized in a Form 8-K filed with the SEC on the following day. The press release stated, in relevant part:

Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced earnings for the first quarter of 2009 of $3,616,425, or $.31 per share. These figures reflect a 1% increase in net income over the first quarter of last year, and a 16% decrease in fully-diluted earnings per share over the same period last year as a result of the Company's common stock offering that was completed at the end of the third quarter of 2008.

\*          \*          \*

*All of the Bank's credit quality ratios continue to be significantly better than those of peer group banks.* Nonperforming loans at quarter-end were at $8.4 million, or .46% of total loans. This figure increased from the previous quarter's end primarily as a result of adding one home loan that is presently under foreclosure. A written offer has been made by a third party to purchase the property for an amount sufficient to satisfy the debt, but whether that sale will be concluded or whether the Bank will have to complete its foreclosure of the mortgage remains to be seen. During the first quarter, under similar circumstances, the Bank's borrowers sold three homes for amounts which satisfied the debts on those properties in full, thereby eliminating those loans from the nonperforming category prior to completion of the foreclosure. In any event, in spite of this small increase, the .46% nonperforming loan ratio compares very favorably to the ratio of 2.40% for the peer group of 293 banks in the nation with assets from $1 billion to $3 billion.

\*          \*          \*

21

The Company's Chairman & Chief Executive Officer, Brad Rock, commented:
"During these difficult times, which many observers think is at or near the bottom
of the economic cycle, *we believe that we are not only weathering the storm
around us, but also taking advantage of opportunities to emerge from the
'financial crisis' as one of the winners for the future.* [Emphasis added.]

46.    On May 8, 2009, SBI filed its Quarterly Report with the SEC on Form 10-Q. The

Company's Form 10-Q was signed by defendants Rock and Florek, and reaffirmed the

Company's financial results previously announced on April 29, 2009. The Company's Form 10-

Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications

contained in ¶ 33, *supra*. Additionally, the Form 10-Q stated, in relevant part:

In the opinion of management, the accompanying unaudited interim consolidated
financial statements contain all adjustments (consisting solely of normal recurring
accruals) necessary to present fairly the Company's financial position and its
results of operations for the periods presented.

47.    The statements contained in ¶¶ 32-34, 36-37 and 39-46 were materially false and

misleading when made because defendants failed to disclose or indicate the following: (1) that

SBI had materially understated its loan loss reserves; (2) that SBI had failed to state certain of its

assets at their fair value; (3) that the Company had delayed recognition of impaired assets; (4)

that the Company's financial statements were not prepared in accordance with GAAP; (5) that

the Company lacked adequate internal and financial controls; (6) that, as a result of the

foregoing, the Company's financial statements were materially false and misleading at all

relevant times; (7) that the Company, through its subsidiary, was engaged in unsafe and/or

unsound banking practices; and (8) that as a result, the Company lacked any reasonable basis for

positive statements regarding the Company, its growth and/or its prospects.

48.    On or about May 14, 2009, the defendants conducted the Offering, selling 3

million shares of SBI stock to investors at a price of $10.00 per share, for gross proceeds of

approximately $30 million. In connection with the Offering, the Company filed the Offering

Materials with the SEC, and stated, in relevant part:

> *Our consolidated balance sheets as of December 31, 2008 and 2007, and the related consolidated statements of income, comprehensive income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2008, and the effectiveness of internal control over financial reporting as of December 31, 2008, included in our 2008 Annual Report on Form 10-K for the year ended December 31, 2008, and incorporated by reference herein, have been incorporated by reference herein* in reliance upon the reports of Crowe Horwath LLP, an independent registered public accounting firm, and upon the authority of said firm as experts in accounting and auditing.

*     *     *

> *The SEC allows us to "incorporate by reference" information that we file with the SEC into this prospectus supplement and the accompanying prospectus, which means we can disclose important information to you by referring you to another document.*

> *The information incorporated by reference is considered to be a part of this prospectus supplement and the accompanying prospectus from the date on which we file that document.* Any reports filed by us with the SEC after the date of this prospectus supplement and before the termination of the offering of the securities by means of this prospectus supplement and the accompanying prospectus will automatically update and, where applicable, supersede information contained in this prospectus supplement or the accompanying prospectus or incorporated by reference into this prospectus supplement or the accompanying prospectus.

> Information about our business and results of operations, financial condition, cash flows, management and other financial and operational data is available in the following documents, which can be accessed at http://www.sec.gov and are incorporated herein by reference (other than, in each case, any document or information that is deemed to have been furnished and not filed in accordance with SEC rules):

> • *Annual Report on Form 10-K and Form 10-K/A for the year ended December 31, 2008;*

> • Proxy Statement dated March 12, 2009;

> • *Quarterly Report on Form 10-Q for the period ended March 31, 2009;*

> • Current Reports on Form 8-K and 8-K/A filed: January 29, 2009 [Emphasis added.]

49.    The Offering Materials were materially false and misleading for the reasons set

forth in ¶ 47.

50.    SBI discussed the Offering in a May 20, 2009 press release entitled "Smithtown

Bancorp Completes $28 Million Stock Offering." This press release stated, in relevant part:

> Smithtown Bancorp, Inc. (NASDAQ: SMTB) (the "Company"), the parent company of Bank of Smithtown, has raised $28.0 million through its previously announced public offering. The Company has issued 2.8 million shares of common stock and will record net proceeds from the offering of approximately $26.5 million after deducting the underwriting discounts and commissions and estimated offering expenses. Additionally, Sandler O'Neill + Partners, L.P., the underwriter for the offering, has an unexercised thirty day over-allotment option to purchase an additional 200,000 shares.

51.    On July 29, 2009, the Company issued a press release entitled "Smithtown

Bancorp Announces Second Quarter Earnings." Therein, the Company stated, in relevant part:

> Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced earnings for the second quarter of 2009 of $3.413 million, or $.26 per share, beating analyst estimates by 2 cents per share, but down compared to $.31 per share during the first quarter of this year. Earnings were reduced by the industry-wide FDIC special assessment during the second quarter to replenish losses to the deposit insurance fund caused by bank failures during the past year. In addition to its regular quarterly deposit insurance premiums, Bank of Smithtown incurred a one-time special assessment of approximately $1.1 million in the second quarter. Without this charge, earnings would have been $4.052 million, up 12% from the previous quarter. EPS would have been $.31, including the impact of the additional shares issued on May 20th in connection with the Company's $30 million common stock offering.
>
> *          *          *
>
> The Company's Chairman & Chief Executive Officer, Brad Rock, commented: "Given the difficulties of these economic times, we believe that our results for the quarter are moderately successful. *We have a strong capital base, we continue to grow loans and core deposits at a strong pace, and we continue to grow our revenue.* Expenses are higher than we would like, but most of that is attributable to economic factors beyond our control, such as unprecedented FDIC insurance costs. Without these costs, we would be growing net income at a double-digit pace, which would make the additional capital we have raised accretive to earnings per share quickly.
>
> "With respect to asset quality, as I have said previously, in this economic environment, we expect the number of slow-paying and non-paying customers to be higher than usual for a while. With more than five million people having lost

their jobs and more than 6,000 bankruptcies being filed every day, it would be unrealistic for us to expect that none of those events will touch Bank of Smithtown. *At the same time, however, because 97% of our loans are secured by mortgages on real estate, usually protected with wide loan-to-value ratios, we do not expect large, unmanageable losses in spite of the dim economic environment.*" [Emphasis added.]

52.     On August 7, 2009, SBI filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Rock and Florek, and reaffirmed the Company's financial results previously announced on July 29, 2009. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 33, *supra*. Additionally, the Form 10-Q stated, in relevant part:

> In the opinion of management, the accompanying unaudited interim consolidated financial statements contain all adjustments (consisting solely of normal recurring accruals) necessary to present fairly the Company's financial position and its results of operations for the periods presented.

## The Truth Slowly Begins to Emerge

53.     On November 2, 2009, the Company issued a press release entitled "Smithtown Bancorp Announces Third Quarter Earnings." The press release stated, in relevant part:

> Smithtown Bancorp (NASDAQ: SMTB), the parent company of Bank of Smithtown, today announced earnings for the third quarter of 2009 of $897,723, or $.06 per share. *Earnings were reduced by a provision of $10 million to the loan loss reserve.*

> Net income for the first nine months of this year was $7.927 million, or $.59 per share. Fully diluted earnings per share for the last twelve months now stand at $.89.

> \*       \*       \*

> The Company's Chairman & Chief Executive Officer, Brad Rock, commented: *"Earnings were negatively impacted during the third quarter by two factors related to the continued economic recession. First, as many Long Island economists have agreed, the various impacts of the recession appear to have hit this region later than in other parts of the country. Second, as has been observed frequently by the Federal Reserve and in financial journals, commercial real estate difficulties appear to be surfacing later in the cycle than*

25

*other manifestations of the recession (such as job losses, home foreclosures and reduced retail sales).*

*"Although nonperforming loans and charge-offs remain better than peer bank averages,"* Mr. Rock continued, *"we nonetheless have to increase loan loss provisions to protect against possible future losses based upon the deterioration observed in our loan portfolio during the third quarter. We also expect levels of nonperforming loans, loan loss provisions and charge-offs to continue to be higher than usual during the fourth quarter of this year and possibly into the first quarter of next year as commercial real estate markets and the region's economy continue to struggle.*

*"But as earnings lag behind our historical success due to the economic woes of the nation and the region, we nonetheless continue to show strong signs of building a valuable franchise.* Core deposits have grown this year by 46%, with total deposits now exceeding $2 billion. We continue to identify and open successful new branch locations at a reasonable cost, as borne out by both our deposit figures and expense ratios." Mr. Rock concluded: "When we look at the steadily-increasing stream of net interest income we are building by matching strong core deposit growth with permanent mortgage lending, we feel that when economic conditions permit us to return to more normalized provisions, we will have a Company with solid earnings growth and an excellent deposit franchise." [Emphasis added.]

54.     In response to this news, the Company's stock fell $1.44 per share, or 13.91 percent, to close on November 2, 2009 at $8.91 per share, on heavy trading volume. However, the full extent of the Company's troubles had yet to be truly disclosed. Indeed, these truths would slowly be revealed over the subsequent months as the Company disclosed the full extent of its exposure to the market and the problems at its subsidiary.

55.     The statements contained in ¶¶ 51-53 were materially false and misleading when made because for the reasons set forth in ¶ 47.

56.     On November 19, 2009, the Company issued a press release entitled "Bank of Smithtown Names New Executives." Therein, the Company stated, in relevant part:

Bank of Smithtown (a subsidiary of Smithtown Bancorp) (NASDAQ: SMTB) has named several new executives for both the Bank and the holding company.

John Romano has been named as President & Chief Operating Officer of the Bank and the holding company. For the past ten years, Mr. Romano has served at

Bank of Smithtown as Executive Vice President & Chief Retail Officer. He previously served as a Vice President at Astoria Federal Savings.

Christopher Becker has been named Executive Vice President & Chief Financial Officer of the Bank and the holding company. Mr. Becker joined the Bank this past April as an Executive Vice President in the finance area. He previously served in roles as Chief Financial Officer and Chief Operating Officer at Bridgehampton National Bank. Anita Florek has also been named as Executive Vice President & Chief Accounting Officer of the Bank and the holding company.

The Chairman of the Board & Chief Executive Officer, Brad Rock, commented: "The Board and I feel that these appointments will strengthen our executive management team. Each of these individuals is capable and experienced, and we look forward to their contributions in their new roles."

57.     This was followed by a December 4, 2009 press release entitled "Bank of

Smithtown Loan Officer Resigns."  This press release stated, in relevant part:

> **Bank of Smithtown (a subsidiary of Smithtown Bancorp) (NASDAQ: SMTB) announced Friday afternoon that one of its loan officers, Tom Stevens, has resigned. Mr. Stevens' lending responsibilities focused primarily in the construction portfolio. The Bank has significantly curtailed its construction lending since September, 2007, shortly after the "sub-prime mortgage crisis" began.**

*     *     *

> The Bank also announced Friday that it has hired Mr. Michael Spolarich as a Vice President in the Loan Department. Mr. Spolarich has more than 15 years experience in banking, most of that time with Bridgehampton National Bank and First National Bank of Long Island as a loan officer.

> The Bank's Chairman & Chief Executive Officer, Brad Rock, commented: "Although we regret Mr. Stevens leaving, we are confident in the balance of the lending team, which remains intact. We are also pleased to have a new officer, Mike Spolarich, joining our loan department. We think that his strong background will add depth to the group." [Emphasis added.]

58.     Shortly thereafter, on December 22, 2009, the Company issued a press release

entitled "No Fourth Quarter Cash Dividend for Smithtown Bancorp."  This press release stated,

in relevant part:

> **The Board of Directors of Smithtown Bancorp (NASDAQ: SMTB) has decided not to declare a cash dividend for the fourth quarter of 2009. The Chairman of**

27

*the Board and Chief Executive Officer, Brad Rock, said: "We expect elevated levels of nonperforming loans and loan loss provisions for the near future, as well as other challenges posed by the current economic and regulatory environment. Therefore, we believe that this is a time to conserve capital."*

During the last recession and real estate downturn of the early 1990's, the Company took similar steps by temporarily halting the cash dividend, and subsequently emerged stronger and more profitable. Mr. Rock commented: "We believe that the fundamentals of the Company remain sound, and once we work through the problem credits precipitated by the recession and current real estate downturn, we expect to return to levels of profitability more consistent with the past." [Emphasis added.]

59.     On February 1, 2010, the Company issued a press release entitled "Smithtown

Bancorp Announces Fourth Quarter Results." Therein, the Company revealed, in relevant part:

Smithtown Bancorp (NASDAQ: SMTB) today announced a loss of $19.8 million for the fourth quarter of 2009, or ($1.34) per fully diluted share. *Operating earnings were more than offset by a provision of $38 million to the loan loss reserve and a write-down of another real estate owned property of $7 million. The net loss for the year was $11.8 million, or ($.87) per fully diluted share.*

*The Company further announced that, on January 29, 2010, its subsidiary, Bank of Smithtown, entered into a Consent Agreement with the Federal Deposit Insurance Corporation (FDIC) and a parallel Consent Order with the New York State Banking Department (NYSBD), hereinafter collectively referred to as the "Consent Agreement."*

At December 31, 2009, the Company's Tier 1 Leverage ratio was 6.39%, the Tier 1 Risk-Based Capital ratio was 8.41% and the Total Risk-Based Capital ratio was 10.52%. The Bank's Tier 1 Leverage ratio was 6.31%, the Tier 1 Risk-Based Capital ratio was 8.29% and the Total Risk-Based Capital ratio was 10.40%.

The allowance for loan losses was $38.5 million at December 31, 2009, or 1.84% of total loans. Asset quality deterioration became an increasing problem in 2009 as the economic recession, especially commercial real estate difficulties, hit our region later than other areas of the country. Nonperforming loans ended the quarter at $130.2 million, or 6.23% of total loans. Loans 30-89 days past due decreased from $51.2 million at the end of the third quarter to $20.8 million, or .99% of total loans, at the end of the fourth quarter. Net charge-offs for the fourth quarter were $22.6 million and for the year were $23.8 million, or 1.22% of average loans.

\*        \*        \*

28

Loan growth slowed to less than 1% during the fourth quarter or $16.6 million as we focused our efforts on managing our existing portfolio. There were continued efforts during the quarter to reduce land and construction loan exposure resulting in a $44.8 million decrease in these types of loans, due to a combination of pay-downs and charge-offs. At December 31, 2009, this loan category constituted 17% of the total loan portfolio, well below the September 30, 2007 high of 31%.

*　　*　　*

The net interest margin for the fourth quarter decreased to 2.89%, and for the year to 2.99%. The net interest margin was negatively impacted during 2009 by an unusually rapid inflow of deposits during the first quarter of the year and reversals of accrued interest on nonperforming loans in the second half of the year. The Company's efficiency ratio moved below 50% during the fourth quarter to 49.80%. The ratio for all of 2009 was 54.97%.

***Regarding the Consent Agreement with the FDIC and NYSBD, the Bank is required to improve credit administration, loan underwriting and internal loan review processes and maintain an adequate allowance for loan losses. Other required actions include the implementation of plans to reduce classified assets, decrease the Bank's concentration in commercial real estate loans and increase profitability. The Bank's payment of dividends and growth in average assets require prior approval of the FDIC and NYSBD. In addition, the Bank is required to maintain no later than June 30, 2010, Tier 1 Capital at least equal to 7% of Total Assets, Tier 1 Risk-Based Capital at least equal to 9 percent of Total Risk-Weighted Assets and Total Risk-Based Capital at least equal to 11 percent of Total Risk-Weighted Assets.***

The Company's Chairman & Chief Executive Officer, Brad Rock, commented: "The board of directors and management are committed to meeting the requirements of the Consent Agreement in a prompt manner. Many of the loan administration items are already completed or near completion. Senior level positions have been filled in credit administration, loan review and workouts."

*　　*　　*

Mr. Rock continued: "The value of our branch network on Long Island, our core deposit base and strong operating income before taxes and provisions are attractive assets. Now that 'blackout' restrictions have been lifted as a result of the issuance of this earnings release, members of the management team and the entire board of directors will be purchasing shares in the open market as we believe our shares are significantly undervalued. In addition, although the Bank currently does not meet the capital ratios required to be maintained under the Consent Agreement by June 30, 2010, based on our existing plans and forecasts, we currently expect to be able to satisfy that requirement without any need to raise additional capital." [Emphasis added.]

29

60.    On this news, the Company's stock declined $0.81 per share, or 14.97 percent, to close on February 1, 2010 at $4.60 per share, on heavy trading volume.

61.    The Consent Agreement set forth, in relevant part:

**BOARD PARTICIPATION AND SUPERVISION**

1.    Within 30 days from the effective date of this ORDER, the Board shall increase its participation in the affairs of the Bank and assume full responsibility for the approval of sound policies and objectives for compliance with this ORDER and for the supervision of Bank management and all the Bank's activities, including but not limited to asset growth, loan administration, credit analysis, internal loan review, the establishment of an adequate allowance for loan and lease losses, and the mitigation of risks associated with concentrations in commercial real estate loans, including acquisition, development and construction loans. The Board's participation in the Bank's affairs shall include, at a minimum, monthly meetings in which the following areas shall be reviewed and approved by the Board: reports of income and expenses; new, overdue, renewed, insider, charged-off, delinquent, nonaccrued, nonperforming, classified and recovered loans; internal loan watch list; investment activities; operating policies; and individual committee actions. The Board minutes shall document these reviews and approvals, including the names of any dissenting directors.

**MANAGEMENT**

2.    (a) The Bank shall have and retain qualified management. Each member of management shall possess qualifications and experience commensurate with his or her duties and responsibilities at the Bank. The qualifications of management personnel shall be evaluated on their ability to:

> (1) comply with the requirements of this ORDER;
>
> (2) operate the Bank in a safe and sound manner;
>
> (3) comply with applicable laws, rules, and regulations; and
>
> (4) restore all aspects of the Bank to a safe and sound condition, including improving management effectiveness, asset quality, loan and appraisal review, credit administration, capital and earnings.

(b) While this ORDER is in effect, the Bank shall notify the Regional Director of the FDIC's New York Regional Office ("Regional Director") in writing of any additions, resignations or terminations of any members of its Board or any of its senior executive officers within 15 days of the event. For purposes of this ORDER, "senior executive officer" is defined in section 303.101(b) of the FDIC Rules and Regulations, 12 C.F.R. § 303.101(b). In addition, the Bank shall

establish procedures to ensure compliance with section 32 of the Act, 12 U.S.C. § 1831i, and Subpart F of Part 303 of the FDIC's Rules and Regulations.

## REDUCTION OF COMMERCIAL REAL ESTATE CONCENTRATIONS

3.      (a) Within 60 days from the effective date of this ORDER, the Bank shall develop and submit a written plan, acceptable to the Regional Director, for systematically reducing and monitoring its commercial real estate ("CRE") loan concentration of credit identified in the FDIC's Report of Examination reflecting the examination of the Bank as of June 30, 2009 ("ROE") to an amount which is commensurate with the Bank's business strategy, management expertise, size, and location. For purposes of the plan, "reduce" means to charge-off or collect CRE loans or to increase Tier 1 capital. Such plan shall include, but not be limited to:

(1) a prohibition of any advance that would increase the CRE concentration unless the advance is pursuant to an existing loan agreement or the Board has submitted to the Regional Director a detailed written statement giving reasons why the advance is in the best interests of the Bank and received the Regional Director's written approval of the advance;

(2) percent of capital to which the Bank shall reduce the concentration, the justification for the capital percentages set forth in the plan, and timeframes for achieving such reductions;

(3) provisions requiring compliance with the *Interagency Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices* (Financial Institution Letter ("FIL") 104-2006, issued December 12, 2006) and *Managing Commercial Real Estate Concentrations in a Challenging Environment* (FIL-22-2008, issued March 17, 2008);

(4) provisions for controlling and monitoring CRE lending, including plans to address the rationale for CRE loan levels as they relate to growth and capital targets, segmentation and testing of the CRE loan portfolio to detect and limit concentrations with similar risk characteristics, and contingency plans for the reduction or mitigation of current CRE concentrations; and

(5) provisions for the submission of monthly written progress reports to the Board for review and notation in minutes of the Board meetings.

*       *       *

## LOAN POLICY

31

4.     (a) Within 60 days from the effective date of this ORDER, and annually thereafter, the Board shall review the Bank's loan policy and procedures for effectiveness and, based upon this review, shall make all necessary revisions to the policy in order to strengthen the Bank's lending procedures and abate additional loan deterioration. Each revision shall be submitted to the Regional Director for review and comment upon its completion. After the Regional Director has responded to the policies, the Board shall adopt the policies as amended or modified by the Regional Director and immediately implement the policies to the extent that they are not already in effect at the Bank.

(b) The initial revisions to the Bank's loan policy required by this paragraph, at a minimum, shall address the recommendations contained in the ROE and provide for the following:

(1) documentation of lines of authority and operational responsibilities within the loan department;

(2) the identification, monitoring, and timely reporting of past due loans, loans with emerging credit weaknesses, and exceptions to the loan policy;

(3) adequate underwriting standards and procedures for loans, loan renewals, and appraisal reviews, including but not limited to standards regarding the type and quality of financial statements required to support a credit from the initial underwriting through the life of the loan;

(4) increased Board and Audit Committee oversight of the Bank's independent loan review function;

(5) expansion of the Bank's appraisal policy to ensure reappraisals or evaluations take place when real estate collateral deteriorates;

(6) expansion of the Bank's construction loan policy to ensure that waivers of liens or the equivalent are obtained for every advance made on construction projects;

(7) compliance with Part 323 of the FDIC's Rules and Regulations; 12 CF.R. Part 323; *Interagency Guidelines on Real Estate Appraisals and Evaluations* (FIL 74-94, issued November 11, 199); and the *Statement of Policy on Uniform Retail Credit Classification and Account Management Policy* (FIL-40-2000, issued June 29, 2000);

(8) determinations of whether extensions of credit constitute "Troubled Debt Restructuring";

(9) guidelines regarding the use and reporting of interest reserves, including limitations on their use and prudent lines of authority for approving their use;

(10) an internal loan watch list and a written plan to lessen the risk position in each line of credit identified as a problem credit on the Bank's internal loan watch list; and

(11) a non-accrual policy in accordance with the Federal Financial Institutions Examination Council's Instructions for the Consolidated Reports of Condition and Income.

## LOAN REVIEW

5.      (a) Within 60 days from the effective date of this ORDER, the Board shall revise its independent loan review program to ensure that it is consistent with the Bank's loan review policy and that it is sufficiently comprehensive to assess risks in Bank lending and minimize credit losses. At a minimum, the revised program shall provide for:

(1) increased monitoring and oversight of loan review by the Board and management;

(2) an increase in the scope and depth of loan review;

(3) an assessment of the overall quality of the loan portfolio;

(4) increased staffing of the Bank's Independent Loan Review ("ILR") with personnel who are independent and meet minimum qualifications;

(5) effective loan classification or credit grading systems that identify, monitor, and address asset quality problems in an accurate and timely manner;

(6) adequate documentation and narratives to support credit ratings and demonstrate that the ILR conducted an independent quarterly review of the Allowance for Loan and Lease Losses;

(7) procedures to identify and report exceptions to the Interest Reserve Policy;

(8) identification of credit and collateral documentation exceptions and an action plan to address the identified deficiencies;

(9) identification of loans that are not in conformance with the Bank's lending policy or laws, rules, or regulations and an action plan to address the identified deficiencies; and

(10) documentation of the rationale for the Bank assigning a different classification than the ILR.

*     *     *

## CLASSIFIED ASSETS - CHARGE-OFF AND PLAN FOR REDUCTION

6.     (a) Within 30 days from the effective date of this ORDER, the Bank shall, to the extent that it has not previously done so, eliminate from its books, by charge-off or collection, all assets or portions of assets classified "Loss" by the FDIC in the ROE. Elimination or reduction of these assets through proceeds of loans made by the Bank shall not be considered "collection" for the purpose of this paragraph.

(b) Within 60 days from the effective date of this ORDER, the Bank shall formulate and submit a detailed written plan to the Regional Director to reduce the remaining assets classified "Doubtful" and "Substandard" in the ROE. The plan shall address each asset so classified where the borrower and any related interest has an aggregate indebtedness to the Bank with a balance of $1,000,000 or greater, as identified in the ROE. In addition, the Bank's plan shall contain a schedule detailing the projected reduction of total classified assets on a quarterly basis and contain a provision requiring the submission of monthly progress reports to the Board and mandating a review by the Board.

*     *     *

(d) While this ORDER is in effect, the Bank shall eliminate from its books, by charge-off or collection, all assets or portions of assets classified "Loss" as determined at any future examination.

## ALLOWANCE FOR LOAN AND LEASE LOSSES

7. The Allowance for Loan and Lease Losses ("ALLL") should be funded by charges to current operating income, and should be calculated in accordance with generally accepted accounting standards and ALLL supervisory guidance. The Bank shall at all times maintain a reasonable ALLL. Prior to the end of each calendar quarter, the Board shall review the adequacy of the Bank's ALLL. Such reviews shall include, at minimum, the analysis required by Financial Accounting Standards Board Statement Numbers 5 and 114, the Bank's loan loss experience, an estimate of potential loss exposure in the portfolio, trends of delinquent and non-accrual loans and prevailing and prospective economic conditions. The minutes of the Board meetings at which such reviews are undertaken shall include complete details of the reviews and the resulting recommended increases in the ALLL.

## RESTRICTION ON ADVANCES TO CLASSIFIED BORROWERS

8.     (a) While this ORDER is in effect, the Bank shall not extend, directly or indirectly, any additional credit to or for the benefit of any borrower whose existing credit has been classified Loss by the FDIC as the result of its examination of the Bank, either in whole or in part, and is uncollected, or to any

34

borrower who is already obligated in any manner to the Bank on any extension of credit, including any portion thereof, that has been charged off the books of the Bank and remains uncollected. The requirements of this paragraph shall not prohibit the Bank from renewing credit already extended to a borrower after full collection, in cash, of interest due from the borrower, or from extending additional credit to a borrower if the Board has submitted to the Regional Director a detailed written statement giving reasons why failure to extend such credit would be detrimental to the best interests of the Bank and received written approval of the extension of credit from the Regional Director.

(b) While this ORDER is in effect, the Bank shall not extend, directly or indirectly, any additional credit to or for the benefit of any borrower whose extension of credit is classified "Doubtful" and/or "Substandard" by the FDIC as the result of its examination of the Bank, either in whole or in part, and is uncollected, unless the Board has signed a detailed written statement giving reasons why failure to extend such credit would be detrimental to the best interests of the Bank. The statement shall be placed in the appropriate loan file, included in the minutes of the applicable Board' meeting, and submitted to the Regional Director in the Progress Reports described in Paragraph 16 of this ORDER.

\*       \*       \*

## CAPITAL PLAN

10.    (a) Not later than June 30, 2010, the Bank shall have and maintain the following minimum capital levels (as defined in Part 325 of the FDIC's Rules and Regulations, 12 C.F.R. Part 325), after establishing an adequate allowance for loan and lease losses:

(1) Tier 1 capital at least equal to 7 percent of total assets;

(2) Tier 1 risk-based capital at least equal to 9 percent of total risk-weighted assets; and

(3) Total risk-based capital at least equal to 11 percent of total risk-weighted assets.

(b) The Bank shall comply with the FDIC's Statement of Policy on Risk-Based Capital found in Appendix A to Part 325 of the FDIC Rules and Regulations, 12 C.F.R. Part 325, App. A.

(c) Within 30 days of the last day of each calendar quarter, the Bank shall determine, from its Reports of Condition and Income, its capital ratios for that calendar quarter.

(d) In the event any capital ratio is or falls below the minimum required by this ORDER, the Bank shall immediately notify the Regional Director and (i)

within 60 days shall increase capital in an amount sufficient to comply with this ORDER, or (ii) within 60 days shall submit a written plan to the Regional Director, describing the primary means and timing by which the Bank shall increase its capital ratios up to or in excess of the minimum requirements set forth in this ORDER, as well as a contingency plan for the sale or merger of the Bank in the event the primary sources of capital are not available. Within 10 days of receipt of all such comments from the Regional Director, and after consideration of all such comments, the Board shall approve the written capital plan, which approval shall be recorded in the minutes of the meeting of the board of directors. Thereafter, the Bank shall implement and fully comply with the written plan.

(e) If all or any part of the additional capital required by the provisions of this ORDER is accomplished by the sale of new securities, the Board shall adopt and implement a plan for the sale of such additional securities, including the voting of any shares owned or proxies held or controlled by them in favor of the plan. Should the implementation of the plan involve a public distribution of the Bank's securities (including a distribution limited only to the Bank's existing shareholders), the Bank shall prepare offering materials fully describing the securities being offered, including an accurate description of the financial condition of the Bank and the circumstances giving rise to the offering, and any other material disclosures necessary to comply with the federal securities laws. Prior to the implementation of the plan and, in any event, not less than 20 days prior to the dissemination of such materials, the plan and any materials used in the sale of the securities shall be submitted to the Regional Director and the FDIC's Accounting, Registration, Disclosure, and Securities Unit, 550 17th Street, N.W. Washington, D.C. 20429 for review and comment. Any changes in the plan or materials requested shall be made prior to the dissemination of the materials.

(f) If the Bank is permitted to increase its Tier 1 capital by the sale of non-cumulative perpetual preferred stock, then all terms and conditions of the issue, including but not limited to those terms and conditions relative to the interest rate and any convertibility factor, shall be presented to the Regional Director for prior approval.

*     *     *

(h) For purposes of this ORDER, all terms relating to capital shall be calculated according to the methodology set forth in Part 325 of the FDIC's Rules and Regulations.

**GROWTH PLAN**

11. While this ORDER is in effect, the Bank shall not increase its Average Total Assets during any quarter without providing, at least 30 days prior to its implementation, a growth plan to the Regional Director. Such growth plan, at a minimum, shall include the funding source to support the projected growth, as

well as the anticipated use of funds. This growth plan shall not be implemented without the prior written consent of the Regional Director.

## COMPLIANCE COMMITTEE

12. Within 45 days from the effective date of this ORDER, the Board shall establish a subcommittee of the Board charged with the responsibility of ensuring that the Bank complies with the provisions of this ORDER. The subcommittee shall report monthly to the entire Board, and a copy of the report and any discussion related to the report or the ORDER shall be included in the minutes of the Board meeting. Nothing contained herein shall diminish the responsibility of the entire Board to ensure compliance with the provisions of this ORDER.

*  *  *

## CORRECTION OF VIOLATIONS

14. Beginning on the effective date of this ORDER, the Bank shall take steps necessary, consistent with other provisions of this ORDER and sound banking practices, to correct and prevent the unsafe or unsound banking practices and/or violations of law or regulation and all contraventions of federal banking agency policies and procedures and guidelines that were identified in the ROE.

<strong>SBI'S VIOLATION OF GAAP RULES<br>IN ITS FINANCIAL STATEMENTS<br><u>FILED WITH THE SEC</u></strong>

62.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

63.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with

GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

64.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)     The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources

entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

65.     The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased SBI securities during the Class Period (the "Class"), including purchasers of the securities issued pursuant or traceable to the Company's public offering on or about May 14, 2009. Excluded from the Class are defendants, directors and officers of SBI and their families and affiliates.

67.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits

to the parties and the Court. According to the Company's Form 10-K filed with the SEC on March 12, 2010, SBI had over 14.9 million shares of stock outstanding, owned by thousands of persons.

68.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Securities Act and/or Securities Exchange Act were violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the prices of SBI securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

69.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

70.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

71.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION/ECONOMIC LOSS

72.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. The price of SBI's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As a result of their purchases of SBI securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

73.    During the Class Period, the defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of SBI's securities during the Class Period.

### Applicability of Presumption of Reliance: Fraud on the Market Doctrine

74.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

41

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased SBI securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

75.     At all relevant times, the market for SBI securities was efficient for the following reasons, among others: (a) as a regulated issuer, SBI filed periodic public reports with the SEC; and (b) SBI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

### NO SAFE HARBOR

76.     Defendants' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

77.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of SBI who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement

42

of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## FIRST CLAIM
### Violation of Section 11 of
### The Securities Act Against All Defendants

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class. This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

79.     This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's securities pursuant to or traceable to the false Offering Materials issued in connection with the Company's May 14, 2009 Offering.

80.     This claim is brought within one year after discovery of the untrue statements and omissions in the Offering Materials and within three years of the effective date of the Offering Materials.

81.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages from the defendants and each of them, jointly and severally.

## SECOND CLAIM
### Violation of Section 12(a)(2) of
### The Securities Act Against All Defendants

82.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class. This count

is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

83. Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Offering Materials.

84. This action is brought within three years from the time that the securities upon which this Count is brought were sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

### THIRD CLAIM
### Violation of Section 15 of The Securities Act
### Against the Individual Defendants

85. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class. This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

86. The Individual Defendants, by virtue of their positions and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of SBI within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause SBI to engage in the acts described herein.

87. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

### FOURTH CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against SBI and the Individual Defendants

88.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.   During the Class Period, SBI and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase SBI securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, SBI and the Individual Defendants, and each of them, took the actions set forth herein.

90.   SBI and the Individual Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SBI securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. SBI and the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

## FIFTH CLAIM
### Violation of Section 20(a) of
### The Exchange Act the Individual Defendants

91.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.   The Individual Defendants acted as controlling persons of SBI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's

operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

93.    The Individual Defendants are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   By virtue of their positions as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:    March 29, 2010

Respectfully submitted,

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

By: _____
Curtis V. Trinko
16 West 46th Street
7th Floor
New York, New York 10036
(212) 490-9550
(212) 986-0158 (fax)

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
D. Seamus Kaskela
skaskela@btkmc.com
David M. Promisloff
dpromisloff@btkmc.com
Steven D. Resnick
sresnick@btkmc.com
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

***Attorneys for Plaintiff***

47

**CERTIFICATION**

I, George R. Yourgal, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

    1.       Plaintiff has reviewed the Complaint, and authorizes its filing.

    2.       Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

    3.       Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

    4.       Plaintiff's purchase and sale transaction(s) in the Smithtown Bancorp, Inc. (Nasdaq: SMTB) security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
| | 500 | B | | 12/7/09 | 6.35 |
| SEE ATTACHED | 500 | B | | 1/26/10 | 5.38 |
| | 100 | | S | 12/16/09 | 6.26 |
| | 150 | | S | 2/24/10 | 4.51 |
| | 750 | | S | 2/26/10 | 4.44 |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

    5.       Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

    6.       During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: ___N/A___ .

    7.       Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of ___MARCH___, 2010.

_____
GEORGE R. YOURGAL